And you can come and now address the second case, which is Isaac v. MBN. Good morning, Your Honors. I've never had a case. Good to see you. I've never had a case. You can begin anew. We're fresh. We give a fresh look at every case. Okay. I appreciate it, Your Honor. And we had a different district judge, didn't we? Yes. Yes, Your Honors. In the first case, we had Judge Alston. Never complained. Second case, we had Judge Brinkema. Different complaints. Many of the same issues. Again, my name is Dirk McClanahan. I'm from the law firm McClanahan Powers here on behalf of the plaintiff, Your Honor. The case was dismissed in a similar posture. I think one of the things that stands out to me from Isaac when looking at Al-Jazani and even understanding some of the court's remarks is Isaac's case, you know, we built a little bit off of the second dismissal from Judge Alston and his commentary and my humble opinion is far more robust in terms of just putting in, if they want, all of the facts that we could put in, in terms of having the actual postings and I think a lot of the issues that I kind of understand the court to have raised with Al-Jazani and I've never had cases back to back like that before, so I'm not sure if I'm supposed to talk about the other case or not mention it. Um, but . . . I'm not sure it helps you too much. In other words, it'd be, I think it'd be cleaner to, uh, we, we have a different complaint here. We're talking about the second, uh, second complaint, the amended complaint and we have some attachments. You have attached the, uh, tweets, uh, uh, and the code and so forth and, uh, we also have a different district judge that analyzed it somewhat differently in my judgment, uh, but it's a 12B6 vote. No, it's a summary judgment, isn't it? No, it's a 12B6. 12B6, right. Uh, 12B6 motion, uh, so we have some of the same principles, but I think, uh, there's enough difference that, uh, you get the benefit of a clean slate. Thank you, Your Honor. Yeah. So, in, in the Isaac case, we got very much into the details about one of the facts I think is significant that came up, and again, it sounds like maybe beating an issue that doesn't, isn't going to matter for this court, but, um, one of the issues we raised specifically or identified was that, in this case, we were very aware that the direct supervisor of Mr. Isaac actually didn't want to terminate him, had no input whatsoever, didn't, thought he was doing great, and that all of the issue to terminate based on the code came from above. The other thing that is different is in this case, there was no discussion as to, you know, take it down or any, you know, insubordination. Well, they both had the verbal warning, right, so this, um, Isaac was also warned, stop posting about Iraqi politics. Um, now, he didn't, it, there wasn't the refusal, right, the insubordination, I refused to take down these tweets, but he also received the verbal warning, stop tweeting about Iraqi politics. He tweets multiple times about Iraqi politics, and he was fired, and in Judge Brinkman's view, if you were going to make a plausible case that this was about national origin, you needed to show someone else who was, uh, violating that warning, tweeting about Iraqi politics, who wasn't fired, um, and they were of additional, a different national origin. This gets to a really interesting issue that I think exists both in Al-Jazani and in Isaac, which is the complaint, as pled, asserts kind of the state of the affair for purposes of the case, other than the attachments that, you know, go one direction or the other. In our complaints, we are taking the position, because this is what our clients were told, that they were terminated not for posting about Iraq, but they were terminated for violating the code. Um, and I think that's an enormous distinction in this case, and it may be that the defendants end up ultimately taking... I'm not sure your complaint is fairly read that way. The code is there, and the code essentially wants the journalist to be neutral on political affairs for good reasons. NBN wants credibility, and they have an audience, and the audience has mixed politics and so forth, and so they want the journalist to stay out of that. That's the code generally, but in this case, it involves specifically, uh, the Iraq situation, and there was a specific, uh, management specifically warned, uh, uh, not to comment about Iraq. Iraq was a hotbed. The Pope had been, uh, had just visited there. This was controversial. There's a question about the theocracy, uh, versus a non-theocracy, the role of the Pope, the role of the, uh, uh, uh, cleric and so forth, and, uh, uh, the idea of a journalist getting involved in making comments about that, uh, four times, uh, after being told not to put up anything about Iraq, uh, uh, it seems to me if you were management, wouldn't it... It's a pretty logical thing. We just can't put up with that. It's pretty clear he understood what he was supposed to do. I, I mean, your complaint's pretty fulsome. I mean, it tells the full story. And we, we tried to be... Yeah, yeah. Put it all... We, we weren't trying to, to sneak anything through, and that's never been my style. But I even... But even... I'm sorry. Uh, you were going to answer... No, no. Your Honor, please. No, no. That's, that's... I'll, I'll let you do that, and then I'll have a follow-up. Um, I, I think the, the courts, and Judge Brinkman as well, was very focused on that particular fact. When we added that complaint, and how I see it, and how I would argue it at, at, to a jury, is that is the impetus of the entire problem in this case, is the, the employer cannot direct a distinction between, we don't talk about Iraq, we don't talk about America, we don't talk about... Well, that might be the problem. Um, what, what are the plausible, what are the facts alleged in the complaint that lead to the plausible inference that this policy, don't post about Iraqi politics, that seems to be what you're saying now, that the policy itself discriminated on the basis of national origin? Right. I, I think, I think these are all intertwined issues. But like, what are the facts that lead to that plausible inference, that this was a discriminatory policy, not based on any legitimate reason? Because the basis of termination that they give is that it's a code violation. Because saying you can't post about your own country is clearly an, an improper instruction. And that's why I think when they first... I don't understand that. If you're a journalist, and you start making on your private commentary, you start making, uh, taking positions on one side or the other, that's critical of a government official or calls the shape ghostly or whatever, uh, these things that he was doing in these tweets. Uh, it's, it seems to me it just undermines the legitimacy of the whole network. Well, your honor, you, you, if I'm going to, I'm going to split hairs on a word you used, which is you're a journalist. And that to me is, is I think a, a distinction that I would argue is not meaningful. But isn't that the employer's decision to make? Ed, I, so whether, so I, I guess the question would be, could I tell my associates, when you post privately, do not post about anything related to the United States. Um, do not post anything about your home country when you're, you're posting. And I give it to all my employees, whether they're from that jurisdiction or not. That is clearly, there's no basis to, to, to do that. There may be no basis to do it, but that doesn't mean it's discrimination on national origin, right? I mean, that may be, uh, someone may think that's a crazy policy and someone may think that infringes on their first amendment rights or something like that. But to say it's a discrimination on the basis of national origin, not to give an instruction to, uh, uh, people from the United States and people from other countries, not to post about, you know, uh, United States employees. I don't see how that makes it a national origin issue. Can I, can I, um, can I reframe it through hyperbole a little bit? Let's say we change the narrative from national origin, which doesn't set off everyone's pings the same way. But let's say I wrote to an employee and say, Hey, we don't want anyone posting about any women's rights. Like, I don't want to hear about women's rights. I don't want to talk about women's rights. We don't mention it. All my associates, we're not journalists. It doesn't matter who we are. Don't post about black people. Don't post about that. I'm giving you some instruction about an identity and that's the sole basis. I think we would all recoil at that notion just because they said it's Iraqi and it's national origin, I think makes it no different. The policy that was the instruction wasn't don't post about Iraqis. Um, it was don't post about politics in this particular country. I mean, you give an example of, um, the Chinese political situation, Tawila, um, who I assume is from your allegations is not a Chinese national, but, um, this employee posted about or said things in an interview about Chinese politics and got reprimanded, right? They got suspended for two weeks. Um, now it wasn't the same verbal warning, right? It was a bigger, a bigger punishment. Um, but that seems to suggest that it's not a, it's not a targeting of particular nationality or particular, uh, just, you know, don't talk about this one country at all. So I think one of the, I hear what you're saying, Your Honor. I think one of the distinctions that I make in this and one of the hard parts that I have, and maybe I'm, I'm too locked in on it and I'm trying to pull myself back. But the, the, the NBN code is an ethics code. And if we're talking, this is where we, I think at the motion to dismiss stage, I think maybe these are arguments that maybe we lose on this at motions for summary judgment. Maybe the facts as they come out are against us. But to say that their position matters as journalists versus anyone else. And to say that they're Iraqis in the, in the type of content and that we're drilling down to because it was Iraqi politics versus, I feel like at the motion to dismiss stage, we're getting very granular in the comparator assessment, which I think is more appropriate at a later stage because we'll have more information. I don't have the job duties or jobs. I had to scrounge to try to get the job descriptions. I could get my hands on to try to show who was similar because it's getting pushed back on, on relationship. And I think at the end of the day, if we're looking at these NBN posts, there's some of the, the Trump tweets that I put in there and whatever side of that line you fall on, it doesn't matter. Clearly for purposes of the NBN code, they're objectively flagrant. And they are posted with impunity repeatedly. And the NBN code doesn't say Iraqi. If it said Iraqi in the NBN code, I would have been attacking the fact that it said Iraqi in the NBN code. But the NBN code just says journalists should be unbiased, impartial, give true statements. Did you allege that there was a specific instruction with respect to Iraq, which is logical because Iraq was a hotspot at the time and there was a specific instruction saying don't post about Iraq, right? That was in March. There was a comment from, I don't have it right here, but there was a, there is, the lines are the same. There was a comment about it, which is why I didn't want to, I wasn't trying to. It's an instruction. Right. And, and it was in violation of, of that position. I didn't understand you to be alleging in your complaint that the policy, uh, with respect to, uh, not posting Iraq, Iraqi, uh, politics, uh, was itself discriminatory. I thought your argument was that the way they applied the code and its enforcement against the Iraqi politics against your client was discriminatory. Uh, so I apologize if we inarticulately identified. What we're trying to show is that the comments and focusing on the fact that they're Iraqi is discriminatory. That, that's the problem. And then the application... Well, that's, that attacks the code itself. In other words, they applied the code, uh, with greater force because of the hotspot in Iraqi, basically saying, uh, uh, don't comment about Iraqi. I mean, especially that's when the Pope went, went to visit at that very point in time. And, uh, uh, and it, it, uh, they were basically telling employees don't post about Iraqi. And, uh, uh, that was what they directed. But you have not alleged, have you, that the policy itself was discriminatory? Other than the comments that we haven't, I, I don't have the complaint right here. Unfortunately, I only walked up here with the one brief, but I, I, my, I think this maybe, uh, maybe the, the district court misunderstood us as well, or yeah, the district court misunderstood us as well, because part of the arguments that we made was that there's a direct discrimination as well as a, as the McDonnell Douglas burden shifting analysis. And, um, but part of our whole position is that they shouldn't be isolating about Iraqi. And I understand the court's position, and maybe there's a fight to be had and a jury could be convinced that, hey, Iraqi is such a hotbed. And I would also say Lebanon is in a constant state of war. All of these countries are in a constant state of war. And with Isaac specifically, different than Al-Jazani, is Al-Jazani makes the post immediately post after the Pope visits. The issue with Isaac is he contends that at the termination, they don't even tell him what the posting problems are. They don't even say like, hey, it's these three postings. That only appears for the first time during the EEOC. So his position is even more estranged than that because they're not even pointing him to the postings that are a violation according to his contentions. That only comes up afterwards. And those postings are sort of scattershot from different points in time. They're not like all posted within three days of each other and, hey, we just can't take it anymore. It's a scattershot of postings over a couple of months that they contend this was somehow the last straw, the one that we didn't tell you about. And so I think for that reason, at the motion to dismiss stage, he's identified numerous comparators, people who are subject to the code, people who are posting with impunity, that I think are flagrant violations. All of his postings, I humbly believe, are not violations. And I would argue that. And I would believe that they aren't. I don't know. I think that the answer is... Wasn't he commenting about the cleric in Iraq? In the bloody Ayatollah? Is that the comment you're making? He does make that comment. And he talks about him looking ghostly? That is the al-Jazani. Al-Jazani refers to him as a ghostly figure. So this one, he said he looked... He criticized that they were entertaining the bloody Ayatollah. But as we put in the complaint, to be fair, the bloody Ayatollah is on a terrorist watch list. This is a... What doesn't matter? He commented about it. I mean, the question is, it's pretty clear he was making a comment about public officials in Iraq. He did make a comment about it, yeah. All right. We'll hear again from... Well, I guess Mr. Bagley, we're going to hear from you. Thank you, Your Honor. May it please the Court, Andrew Bagley, Crowley Mooring for MBN. This case is, for obvious reasons, very similar indeed to the al-Jazani case that we've just heard. But there are a couple of things that I want to point out in particular, given the slightly different phrasing and framing of the complaint that was presented to Judge Brinkman. The first thing that the Court has already asked about is the Maryland... I'm sorry, the MBN case. Code. And so, if we could take a very quick look at Joint Appendix 151, which is the code itself. And it talks about the social media policy generally. And it says, don't damage credibility of you as a journalist, because this could undermine MBN's mission. I think it's a truism that MBN gets to decide what its mission is and determine what doesn't. I'm not sure this saves them. But if a company may very... A company might very well have a good reason for saying, don't post about Iraq political matters at a particular time. But, you know, if your concern is that post, personal posts generally about political matters undermine, you know, the news outlet's credibility, what about the argument that you're allowing posts and commentary about political matters in other countries, but not Iraq? That's what your colleague suggests may be an issue. What's your response to that? My response is that when you look at the countries covered by MBN's mission in 2021, Iraq stands out. And it is its own hotbed. And it's its own source of problems from a foreign policy of the United States. And as such, the guidance to pick up on what you said, Judge Rushing, is not don't post about your life. Don't post about international affairs generally. It's just don't post about Iraqi politics. Things are explosive right now. And it is not a term and condition, a protected term and condition of employment to post about Iraq. It's not a big... That admonition applied to Iraqi employees and non-Iraqi employees as well? Absolutely. And that's why, at the end of the day, MBN gets to decide what its mission is, what it needs to protect itself, its credibility online, the safety of its people in Iraq and elsewhere. And so they place a limit on social media for purposes of Iraqi politics. That's a very small limitation. And I don't think it smells of discrimination because they can tweet about anything else they want. And this is what's so interesting in this case for Mr. Isaac. Judge Brinkman, upon the first dismissal of the case said, you need to tell us more specifically what the tweets at issue were that Mr. Isaac posted in the wake of this warning not to do it. And in fact, that ends up being the only amendment to the complaint between the original and the amended complaint in this case. It's nine paragraphs starting at paragraph 80. And it lays out in Mr. Isaac's own words what his tweets were about. Your Honor, let's take a look at paragraph 83, Joint Appendix 142. Plaintiff explains that one of his tweets concerns a, quote, controversial speech, unquote, by an Iraqi person, quote, sanctioned by the US for terrorism. OK, why would you post such a thing if you've been told to stay away from Iraqi hotbed issues? At paragraph 84, again, the plaintiff advances in his own complaint, what it is that he said in the tweet. And he talks about the prosecution of a high profile figure in Iraq and pointing out, quote, elected official was meeting with a criminally accused figure. Come on. Paragraph 85, Joint Appendix 143, he talks about the book that was mentioned earlier today, the book discussing violence against US troops. And lastly, in paragraph 86, Joint Appendix 143, he talks about a public figure, quote, government institution in Iraq. I mean, how close does it have to get to politics and government function in Iraq, which you've been told not to do? Your Honor, the complaint itself is the plaintiff telling the court why he got fired. And then the last thing I'll mention before inviting the court's questions, if I may, is that there's one thing that all of these things have in common, the com, the, I'm sorry, that the comparators that have been advanced in the complaint have in common. Not one of them is alleged to have tweeted about Iraq. Not one of them is tweeted, is alleged to have said things that basically go directly against directive. Does MBN broadcast only in the Near East? It broadcasts, this is a more difficult question, and forgive me for giving you the long version. At the time, there was television, um, both throughout the Middle East and North Africa, what they call the MENA region, which covers all the Northern Africa and the Middle East. Then there was a separate television station, TV Iraq, that was direct specifically geared at Iraq. There are radio stations that go to the entire region. Um, the Trump administration, the second time around, through the U.S. Agency for Global Media, has sought to drastically reduce the scope of MBN, along with its sister companies, Radio Free Asia, Radio Free Europe, Voice of America, which is much in the news, with Kerry Lake, basically trying to take a hatchet at the companies. And so it is now much smaller. And to answer your question today, the scope of its broadcasting is much smaller, but it goes throughout the region. I was interested more at the time. At the time, yes, television had a specific Iraq television channel and a Al Hurra Iraq and a television station that went to other countries in the region. Um, and the reality is that MBN also has a lot of staff located in those countries. And so there's an element when to bring this back. That's not in the record, though. I mean, you're talking about stuff out there outside the record now. I think it, yes, that's, that's absolutely right. That's a little bit dangerous for you, right? I mean, you're talking about outside the record and want us to decide something on the complaint? No, absolutely, Your Honor. I would only mention that when it comes to the MENA, comes to social media policy, when it comes to the MBN code and interpreting the code, the fact that the operations are throughout the region, even if that's outside the record, I think the court can take judicial notice of the fact that that exists. There's a reason for the safety, the elements that go into these policy statements do include the safety of personnel. Yeah, and so at the end of the day, I don't think I want to, I'm not going to repeat much else that you've already seen in our briefs and heard this morning. But if the court has other questions, of course, I'm happy to respond. Thank you. Ms. Ambrose, are you in on the same position? All right, thank you very much. All right, Mr. McClanahan, we'll hear your rebuttal. Thank you again, Your Honors. I'm sure you're getting your fill of having heard me at this stage. But I'll just address some of the points and comments that Mr. Bagley made, if I may, briefly. One of the comments was a statement that the company issued that proclamation not about not talking or posting about Iraq to the company. Certainly, that's not how the complaint is pled, and that's not how I understand that directive to have been instituted. This wasn't like a company-wide email. This was a statement to three Iraqis. And I think that's a significant, again, as we were sort of building and seeing the case, how we structure it, as opposed to like some company-wide mandate. And again, as I'm embedding it in the NBN code, it's not. That's a completely separate item, at least as far as anything I was aware of. Well, and your complaint says that these multiple Iraqi journalists were given a verbal warning to stop posting any political content about Iraq, which makes it sound like they had been doing it already. So it was targeted at them because they had already been posting. Thank you. Is that a fair inference? I believe that's right, Your Honor. Um, again, the issue that I would also point out is we counsel reads the content and commentary from the postings. The postings that are posted by Mr. Isaac, again, we added those as to Judge Brinkham's request because she wanted to frankly see what they were. But our position has always been in our complaint alleges that at the time of termination, they do not identify the postings in any way. They do not suggest anything to them about the postings. They just say, we're terminating you. There were postings. He inquires about the postings and they won't identify what they were. That comes up only afterwards. Was that in the EEOC process that it came up? Yes, Your Honor. Or at least that's our... With respect to the other side, they contend a different position. But that has been our client's... Our point... That has been the plaintiff's position. That's what was pledged. And so, again, I think if we're looking at application of the code, Judge Brinkham focused on that comment about the verbal warning. And I think really wanted us to find a comparator. And the only comparator in her mind could be a comparator that absolutely met that same equivalency where there had somehow been a warning to them as well and that they posted about Iraq. I think our position was that that was a very narrow... That would be very... You're almost shooting down the death star to get someone who meets that level of comparator. And I think one of the things we tried to show in the complaint argued in the brief... Well, if you allege that somehow the warning about Iraq is not connected to your termination, then you've almost got zero reason for discrimination. There's a... The question is you have no comparators, you have no animus, you have no Iraqi connection because you... That argument detaches. I mean, your complaint fairly stated says that he posted four postings about Iraq and was terminated because of that. That's what I think a fair reading your complaint is. If you're now arguing that that allows a plausible claim based on the notion that Iraq had... Those postings had nothing to do with this termination and the warning had nothing to do with this termination, then you basically have out of the blue somebody coming and terminating them. And the question now is where is your... Where are your allegations that that termination was based on his Iraqi background? I think that that gets back to that the... This is where we're doing a disparate treatment analysis. And that's kind of, I think, what largely in a lot of the cases that we get into start to trend into the McDonnell Douglas analysis because it's... I'd like to know about your complaint. What's the theory? Right. We're talking about a story, a factual story. And that's what we're trying to get to. So I think the... And I know you, you're saying that juries can find facts different from the complaint, but at a 12 v. 6, we take the complaint and we read the facts as alleged and determine whether those facts allege cause of action. But if you all of a sudden start eliminating your allegations, you have in there the fact that there were warnings about not posting. You have in there, there were four postings relating to Iraq. You have the fact that he was terminated and you allege that his termination was because he was Iraqi. And now if you want to say the complaint doesn't make enough connection to... Then your allegation is totally irrelevant about the postings about Iraq and your allegations about the four postings adding those is totally irrelevant. Basically, your complaint, we take that out. Your complaint is that he was a journalist at NBN and on a given date, he was fired for no reason. I'm beyond my time, but if I may, with 30 seconds, just respond. I'd like to hear your response, yeah. So I think the distinction to me, Your Honor, is it has never mattered to us as the plaintiff and in the complaint as pled that the postings were about Iraq. The issue is that he is Iraqi. It's not a whether it makes it. We take the complaint as thing. Your motive about whether you thought it's important or not. Our complaint is national origin because he's Iraqi. If he had been posting, we would have... That's not enough to state a cause of action. We're saying that other non-Iraqis are posting, whether it's about Iraq or not, and they are being found to have violated the code and others aren't. And the sole distinction that we're showing in disparate treatment through all of the The content being about Iraq is a defense theory. That's not... Our theory was never predicated on the fact that our postings are about Iraq. Our postings, we are contending, are not relevant to the analysis because they're not... They don't care if it's relevant. They're only eliminating us because we're Iraqi individuals. And time and time again, in the examples we use against non-Iraqi individuals who are clearly violating the code, our guys are getting terminated for violating the code. They're not. What's the difference? The difference, we contend, is that we're Iraqi individuals. Okay. Thank you, Your Honor. All right. We'll come down and greet counsel. We'll give you a double greeting for the double cases and we'll take a short recess. This honorable court will take a brief recess.
judges: Paul V. Niemeyer, A. Marvin Quattlebaum Jr., Allison J. Rushing